IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| CORDELE DEVELOPMENT<br>CORPORATION | §<br>§<br>§ | |
| VS. | §<br>§ | CIVIL NO. 5:11-CV-00005<br>JURY |
| EDISON MISSION ENERGY,<br>CEDRO HILL WIND, LLC, AND<br>WANZEK CONSTRUCTION, INC | §<br>§<br>§ | |

**PLAINTIFF'S COURT-ORDERED SUPPLEMENTAL BRIEF**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES CORDELE DEVELOPMENT CORPORATION (hereinafter called "Plaintiff" or "Cordele"), Plaintiff in the above-entitled and numbered cause, and does make and file this its Court-Ordered Supplemental Brief. In support of same, Plaintiff would respectfully show unto the Court the following:

**I.**
**PROCEDURAL BACKGROUND**

1.      On September 28, 2012, the Court issued a Memorandum and Order Granting Summary Judgment in Part and Ordering Supplemental Briefing. *See* Docket Entry 35. The Court's original order required Plaintiff to supplement the record and provide additional briefing on or before October 12, 2012. *See id.* On October 10, 2012, the Court granted Plaintiff's unopposed motion to extend the supplemental briefing deadline to October 26, 2012. *See* Docket Entry 39.

2.      The Court has ordered Plaintiff to "supplement its brief, and the record if necessary, to demonstrate that Jeanette West Hannasch and Tommy West qualify as experts under Federal Rule of Evidence 702[;] specifically, that Jeanette West Hannasch

and Tommy West are qualified as experts with respect to construction (i.e., capable of testifying to the actions of Defendants that caused damages to Cordele's existing structures) and with respect to drilling (i.e., capable of testifying that the actions of Defendants necessitated directional instead of vertical drilling)." Docket Entry 35 at 5. The Court further ordered Plaintiff to "supplement the record with a summary of the underlying facts which form the basis for the previously submitted opinions to which Jeanette West Hannasch and Tommy West are expected to testify as required by Rule 26(a)(2)(C)." *Id.* Finally, the Court has ordered Plaintiff to supplement the record with the following:

> *(1)     The deeds, if any, showing that "Plaintiff has possessed mineral interest and easement rights to the [property subject to this case] for many years;*
>
> *(2)     The deeds and documents, if any, showing proof of ownership of any pipelines that have been damaged by Defendants' construction;*
>
> *(3)     Existing maps and land surveys, if any, of the De La Garza property; and*
>
> *(4)     The contract(s) between Plaintiff and Houston Pipeline Company, if any, which form the basis of the tortious interference with existing contract claim.*

*Id.* at 5-6.

3.     Much of the factual background of this matter has been previously and extensively recited by Plaintiff. *See* Docket Entry 26 at ¶11 – ¶37; Docket Entry 27 at ¶1 - ¶4. Therefore, all reasonable effort will be made to avoid redundancy to the extent possible. Documents responsive to parts (1) – (4) of the Court's Order, above, have been incorporated into Supplemental Exhibits 2 through 9.

**II.**
**<u>SUPPLEMENTAL EVIDENCE</u>**

4.      In support of the Supplemental Brief, Plaintiff relies on the following true

and correct copies of evidence attached to the Supplemental Appendix hereto:

| | |
|---|---|
| Supplemental Exhibit 1 | Supplemental Declaration of Thomas West, Jr. |
| Supplemental Exhibit 2 | Webb County Recorded 1973 Assignment of Lease to Thomas West, Jr., founder of Cordele Development Corporation with 1959 predecessor Oil and Gas Lease |
| Supplemental Exhibit 3 | Signed 1973 Application for Permit to Drill for minerals on De La Garza Survey 336 |
| Supplemental Exhibit 4 | Cordele Development Corporation Rights-of-Way leases for properties adjacent to De La Garza Survey 336 dated 1981, 1998 and 2004, respectively |
| Supplemental Exhibit 5 | Webb County Recorded Assignments of Oil and Gas Leases to Cordele Development Corporation dated January 1995 through April 1996 |
| Supplemental Exhibit 6 | May 2003 Plat of Proposed Well Location on Survey 336 from Cordele Development Corporation to Texas Railroad Commission |
| Supplemental Exhibit 7 | April 2005 Gas Purchase Agreement between Cordele Development Corporation and Houston Pipeline Company with Amendments |
| Supplemental Exhibit 8 | August 2009 Cedro Hill Wind Phase I Plat of Survey 336 and detail survey showing purported "ABANDONED" well locations and pipeline of Cordele Development Corporation |
| Supplemental Exhibit 9 | February 2010 Cordele Development Corporation/De La Garza Survey 336 of Proposed No. 5 Well Location |

5.      Plaintiff also hereby incorporates by reference, and relies upon in support

of its Supplemental Briefing, its prior Response (Docket Entry 26 with exhibits),

pleadings on file with this Court, discovery exchanged between the parties, and all pleadings and evidence filed in support of the contested motions in this matter.

### III.
### QUALIFICATIONS OF THOMAS WEST, JR. AS AN EXPERT WITNESS

6.      Thomas West, Jr. is one of the testifying expert witnesses that has been designated by Plaintiff.  *See* Pltf's Supp. Exh. 1 at ¶2.  To provide additional information to the Court addressing his qualifications to offer expert opinions with respect to construction and drilling as requested by the Court, Mr. West has offered a Supplemental Declaration that is intended to be in addition to, and not in place of, the prior Declaration he has offered in this matter.  *See id* at . ¶6.

7.      Mr. West is the founder of Cordele Development Corporation ("Cordele") and has been designated as an expert witness by the Plaintiff in the above-styled matter.  *See id.* at ¶2.  The property made the subject of this lawsuit is known as De La Garza Survey 336.  *See id.*  Mr. West obtained the assignment of the Oil and Gas Lease on May 1, 1973 pursuant to the original Oil and Gas Lease for the subject property.  *See id.* at ¶2; Pltf's Supp. Exh. 2.

8.      In 1973, the same year he obtained assignment of oil and gas rights on the subject property, Mr. West began exploring for and producing oil and gas from the subject property.  *See* Pltf's Supp. Exh. 1 at ¶3; Pltf's Supp. Exh. 3.  The production of gas and oil on the subject property began in 1973 and has been continuous ever since. *See* Pltf's Supp. Exh. 1 at ¶3.

9.      Part and parcel to mineral drilling operations is the transport of minerals being produced to a mineral purchaser.  *See id.* at ¶4.  As such, the construction of

mineral (gas and oil) pipelines to transport the minerals is usually necessary. *See id.* On the subject property, Mr. West has designed and supervised the construction of a series of pipelines from producing well locations to various metering stations where the minerals are quantified and sold. *See id.* The pipelines at issue that were damaged by Defendants in this matter are such pipelines. *See id.* Mr. West built and owned the pipelines and subsequently transferred ownership of the pipelines to Cordele Development Corporation. *See id.* Cordele Development Corporation owned the pipelines at issue in this matter prior to 2009, and the ownership of such pipelines has never been assigned, leased, or in any other manner conveyed to any other individual or entity. *See id.*

10. Mr. West did not require a deed or right-of-way agreement for the construction or laying of the pipelines on the subject property because the Assignment of Oil and Gas Lease he obtained in 1973, which he subsequently transferred to Cordele Development Corporation, expressly "*bargain[ed], s[old], transfer[red], and convey[ed] all rights, title and interest of the original lessee and present owner*" to him, and the original 1959 lease expressly authorized the lessee to "*lay pipe lines, build[] tanks, stor[e] oil . . .*" for the purpose of "*prospecting and drilling for and producing oil and gas. . . .*" Pltf's Supp. Exh. 1 at ¶5; Pltf's Supp. Exh. 2. However, rights-of-way agreements were sought and obtained for adjacent properties at points from which the pipeline owned by Cordele Development Corporation ran off of the subject property, De La Garza Survey 336. *See* Pltf's Supp. Exh. 1 at ¶5; Pltf's Supp. Exh. 4.

11. Mr. West obtained dual Bachelor of Science degrees in petroleum engineering and geological engineering from Texas A&M University – College Station in

1954. *See* Pltf's Supp. Exh. 1 at ¶7. As part of his curriculum in petroleum engineering, he completed courses in physical geology, mechanics of materials, reservoir petrophysics, reservoir fluids, petroleum drilling systems, petroleum production systems, petroleum geology, petroleum project evaluation, reservoir development, drilling engineering, production engineering, transport procedures in petroleum production, petroleum well production and performance, formation evaluation, and reservoir description, among many others. *See id.*

12. As part of his curriculum in geological engineering, he completed many courses that both complimented and supplemented his education and knowledge in petroleum engineering, including physical geology, geological field methods, global geophysics, sedimentology and stratigraphy, field geology, hydrogeology, and engineering geology, among many others. *See id.* at ¶8.

13. By completion of those courses of study, he developed a solid foundation of education and knowledge pertaining to the nature of oil and gas reservoirs, petroleum exploration and drilling, design and evaluation of well drilling systems, identification and solution of drilling problems, casing design, formation evaluation, completion and production, including production systems and transport of petroleum products, construction of surface facilities, including construction and operation of drilling rig components, fundamental petroleum engineering concepts such as pressure loss calculations, fluid mechanics, flow rate evaluation, friction loss, turbulent flow, casing, piping, cementing, directional and horizontal drilling, deliverability testing, backpressure analysis, downhole and artificial lift equipment, safety systems, reservoir mechanics and development, reservoir management, and improved oil mechanics. *See id.* at ¶9.

14. Upon graduation from college, Mr. West was commissioned a Second Lieutenant in the U.S. Army Corps of Engineers. *See id.* at ¶10. He entered active duty in May 1954 and was honorably discharged as a First Lieutenant in May 1957. *See id.* Because of his Petroleum Engineering degree, he was assigned to the 515th Engineer Pipeline Company at Ft. Belvoir, Virginia, the headquarters for the Corps of Engineers. *See id.* The mission of the 515th Engineer Pipeline Company was to design, test and field test all new and old equipment used in pipelines, pumps and other related equipment for the U.S. Army. *See id.* He was then assigned to the Engineer School at Ft. Belvoir, teaching "Pipeline Design," "Pipeline System Design" and the "Military Application of Geology" during this period at the Engineer School. *See id.* He held the only (MOS) in the U.S. Army as a geologist. *See id.*

15. With that education, training, knowledge and experience as a foundation, I embarked on a private-industry career and gained tremendous experience using the theories, methods and procedures that he learned relating to both petroleum and geological engineering. *See id.* at ¶11. Additionally, he has attended numerous continuing education courses relating to the exploration, drilling and production of petroleum products, specifically including courses on vertical versus horizontal drilling methods, as well as construction of surface facilities that may impact drilling operations. *See id.*

16. Mr. West has used his education, training, knowledge and experience as a geologist, petroleum engineer, and oil and gas operator extensively in his career that has spanned 58 continuous years. *See id.* at ¶12. During his lengthy career, he has gained a tremendous amount of experience using the concepts he learned during his

initial education and training.  *See id.*  For example, on many occasions, he has gathered geological information from known sources, interpreted that information and then mapped subsurface geological rock formations and hydrocarbon zones.  *See id.*  In the past 58 years he has acquired by lease and/or assignment mineral interests that he believed to contain oil and gas (known as a prospect) and has marketed the prospects to persons and/or companies in the business of oil and gas exploration, drilling and/or production.  *See id.*  When he has deemed prospects as viable and they have been funded, he has obtained the necessary regulatory permits and drilled a well.  *See id.*  As such, he is well-familiar with regulatory issues involved in the exploration, operation, production and transport of petroleum facilities and their products.  *See id.*

17.  When the well bore in his drilling operations has encountered oil and/or gas in sufficient quantities that he has believed to be commercial, he has completed the well as a producer and begun to produce hydrocarbons from the well.  *See id.* at ¶13. On occasion, he has encountered obstacles that have necessitated directional or horizontal drilling for minerals rather than vertical drilling.  *See id.*  Both directional and horizontal (i.e., non-vertical) drilling are substantially more costly than vertical drilling because more skilled labor is involved, procedures are more complex and time-consuming, and equipment is much more specialized and expensive.  *See id.*

18.  As previously stated, he continues to be active in oil and gas exploration in the South Texas and Gulf Coast Regions (Railroad Commission Districts 2 and 4).  *See id.* at ¶14.  He drills approximately five (5) wells per year with a 35% success rate and has done so for many years.  *See id.*  He has drilled approximately 323 oil and gas wells and completed 218 oil and gas wells as producing wells in his career as an oil and

gas operator in the Gulf Coast region and South Texas. *See id.* In Duval, Jackson, Victoria, Bee, Live Oak, Lavaca, McMullen, Webb and Zapata counties, he has discovered, drilled, completed and operated 118 oil and gas wells since 1954. *See id.*

19. Mr. West has participated in the discovery of the South Mineral Field, Bee County; Ragsdale Field, Bee County, Pressly Field, Jackson County; South-East Cordele Field, Jackson County; East Cordele Field, Jackson County; East Cordele Field, Jackson County; Appelt Field, Jackson County; North Telferner Fields, Victoria County; Kolle Field, Victoria County; Garcitas Creek Field, Victoria County; Salem Field, Victoria County; North Lopez Field, Duval County; Cole Field, Duval County; Neely-East Field, Duval County; East Colleto Field, Duval County; North Carolina-Tex Field, Webb County; West and East Extensions of the Provident City Field, Lavaca County; Loma Alta "Yegua", McMullen County; West Telferner, Victoria County; East and West Boyle Fields, Starr County; and the North Spring Branch Field, Live Oak County.

20. As stated, Mr. West is a current or former member of each of the following professional societies: American Association of Petroleum Geologists; San Antonio Association of Petroleum Landmen; South Texas Geological Society; Society for Petroleum Engineers (SPE); The Society of Independent Professional Earth Scientists (SIPES), Texas Independent Producers and Royalty Owners; Independent Petroleum Association of America; Balcones Geological Service, Inc. (President 1981 Alamo Geological); and Founding Member and served on Board of Directors for San Antonio Petroleum Club. *See id.* at ¶16. Membership in these professional societies has facilitated additional experience in matters such as those at issue in this lawsuit. *See id.*

21. Because of his education, knowledge, training and substantial experience

in geology, petroleum engineering, as an oil and gas operator, and professional affiliations, with my experience having come through his own efforts, Mr. West is very familiar with, and well-qualified to address, many of the contested issues that have arisen in this case, specifically including the need for vertical drilling versus directional or horizontal drilling. *See id.* at ¶17. Based on his education, knowledge, training, and vast experience, and based on the facts previously stated, as well as facts of which he has personal knowledge stated in his supplemental declaration and below, it is Mr. West's opinion that the negligent, grossly negligent and/or intentional actions of the Defendants in this case necessitated directional or horizontal drilling rather than vertical drilling for a well on land leased by Cordele that had been proposed for years. *See id.* As such, and because directional and horizontal drilling are more time-, labor-, and cost-intensive than is vertical drilling, these negligent, grossly negligent and/or intentional actions by Defendants are the direct and proximate cause of the anticipated increased costs and expenses to Cordele for the proposed drilling on De La Garza 336. *See id.*

22. Drilling operations have naturally included construction of surface facilities, including rigs, tanks, pipelines, outbuildings, roads, and fencing. *See id.* at ¶18. In addition to Mr. West's education and training, he has become abundantly experienced in the construction of surface facilities given that surface facilities are required and constructed in virtually all drilling operations he has conducted and/or performed. *See id.* Because Mr. West is familiar with the well-known proposition that the construction of surface facilities on or around petroleum production facilities always has the potential of damaging surface-level or subsurface interests, including pipelines, the construction of surface facilities on or around petroleum production facilities (or proposed petroleum

production facilities) must be done with detailed planning and great care not to damage surface-level or subsurface interests. *See id.* Further, it is critically important that prior to performing construction operations on or around petroleum production facilities, or on or around land on which mineral interest production operations are being performed or proposed, that a careful search of land records be performed to verify that construction will not adversely affect current or proposed petroleum production exploration or operations and/or superior mineral interest rights. *See id.*

23.     Because of Mr. West's education, knowledge, training and substantial experience in geology, petroleum engineering, as an oil and gas operator, and professional affiliations, with his experience having come through his own efforts, he is very familiar with, and well-qualified to address, many of the contested issues that have arisen in this case, specifically including causation of damages to oil and gas production and transportation equipment due to construction on or around such equipment. *See id.* at ¶19. Based on his education, knowledge, training, and vast experience, and based on the facts previously stated, as well as facts of which he has personal knowledge stated in his supplemental declaration and below, it is Mr. West's opinion that the negligent, grossly negligent and/or intentional actions of the Defendants in this case caused damages to Cordele's existing structures. *See id.*

### IV.
### QUALIFICATIONS OF JEANETTE WEST HANNASCH AS AN EXPERT WITNESS

24.     Jeanette West Hannasch is the President of Cordele. *See* Docket Entry 26, Exh. 4 at ¶2. She has extensive qualifications and experience as a landman and oil and gas operator, and she has vast experience with operations attendant to oil and gas

exploration such as the oversight of drilling, right-of-way completion, and day-to-day operations of Cordele, road and drill-site location construction, accounting for oil and gas production to all royalty and working interest owners, reporting to the Texas Railroad Commission, payment of taxes, the performance of all statutory and regulatory duties required in Texas for a registered oil and gas operator and the interactions with suppliers, service companies, landowners, royalty owners, working interest owners and other mineral interest owners. *See id.* As such, her declaration was offered to address duties related to land and title searches, the necessity to perform due diligence, including title searches of public records, in obtaining and exercising rights to real estate, the interplay of surface and mineral interest rights, oil and gas operations and the administration of an oil and gas company. Her declaration was not offered to address those matters of causation with respect to damages of Cordele's existing structures caused by Defendants' actions or with respect to whether, how and/or why Defendants' actions necessitated directional or horizontal drilling instead of vertical drilling. Accordingly, Plaintiff's evidence on those matters rests on the anticipated testimony of Thomas West, Jr.

## V.
## FACTS FORMING BASIS FOR EXPERT OPINIONS

25. Plaintiff incorporates by reference as if fully set forth herein all facts, as well as evidence supporting same, previously submitted by Plaintiff to the Court.

26. Plaintiff is the lessee of the mineral interests to a tract of land in Webb County, Texas, known as De La Garza Survey 336, as well as the possessor of rights-of-way and easements on adjacent tracts of land through which a gas pipeline owned

---

and/or utilized by Plaintiff runs.  *See* Docket Entry 26, Exh. 2 at ¶3 and Exh. 4 at ¶8;

Pltf's Supp. Exh. 1 at ¶4.  Thomas West, Jr. acquired these mineral interests in 1973,

long before Defendants acquired a surface interest in the subject property.[1]  *See id.*;

Pltf's Supp. Exh. 2.  Plaintiff has conducted mineral exploration on the subject land for

years.  *See* Pltf's Supp. Exh. 1 at ¶4; Pltf's Supp. Exhs. 3 – 7.  Plaintiff also owns and

operates certain pipelines on the subject property used to transport minerals extracted

from the subject property for sale and distribution.  *See* Pltf's Supp. Exh. 1 at ¶4.  Pltf's

Supp. Exh. 4, 7.

27.    As justification of their right to perform construction and conduct wind

energy farm operations on the subject property without notice to or the consent of

Plaintiff, Defendants rely exclusively on a Grant of Windpark Easement and Easement

Agreement dated effective July 1, 2009.  *See* Pltf's Supp. Exh. 1 at ¶5; Docket Entry 24

at 8, 10 and Exh. 2.  By that document, the Owner granting the easement agreed that

"any use or development of [] mineral interest[s] in the Property . . . [would] not interfere

in any way with the use of the surface of the property. . . ."  Pltf's Supp. Exh. 1 at ¶5;

Docket Entry 24, Exh. 2 at ¶11.3.

28.    Had the Grant of Windpark Easement and Easement Agreement with the

effective date of July 1, 2009 been in effect at the time of Defendants' construction,

Defendants arguments might have some merit.  However, the very document upon

which Defendants so heavily rely was amended two months later, in September 2009,

deleting paragraph 11.3 in its entirety and substituting in its place, in part, the following

---

[1] Defendants acquired surface interest rights to the subject property in or around 2009.  The fact that
Plaintiff had pre-existing mineral interest rights to the subject property has not been disputed by any
defendant.  Defendants simply assert that "Cordele does not enjoy *exclusive* rights to use the surface" of
the property.  Docket Entry 24 at 8-9 (emphasis added).

language in a section entitled "Mineral Protection Provision": "*This Agreement* [that is, the document defining Defendants' easement rights] *is subject to any and all existing and recorded pipeline, road or utility easements and oil, gas or mineral leases covering the Property or any part thereof*." Pltf's Supp. Exh. 1 at ¶6; Docket 26, Exh. 3 at p. 3, ¶4. In other words, the undisputable fact is, despite Defendants' misleading statements and failures to disclose to the Court, that any surface rights Defendants have to the subject property were expressly made subject to the pre-existing mineral interest rights of Plaintiff and others similarly-positioned. Unfortunately, this amendment was inconspicuously hidden and unreferenced in the nearly 500 pages of exhibits submitted by Defendants in their attempt to demonstrate there are no genuine issues of material fact as to any issue in Plaintiff's claims.

29. Defendants admit that construction on the subject property began in November 2009. *See* Docket Entry 24 at 10. They further acknowledge that construction "continued into 2010, and included construction of access roads as well as . . . turbine structures and [] associated power cable runs. . . ." *Id.* at 10-11.

30. In December 2009, Plaintiff learned from a Houston Pipeline Company technician, the company with which Plaintiff has a contract to meter and purchase gas production from Plaintiff's wells in the area (*see* Pltf's Supp. Exh. 4), that there was heavy construction occurring close to the pipeline meter tap. *See* Pltf's Supp. Exh. 1 at ¶8; Docket 26, Exh. 2 at ¶13; Exh. 4 at ¶18. Plaintiff learned that the pipeline meter for Plaintiff's producing well on the subject property had been shut off as of the early morning of November 10, 2009, which was, ironically, the same time Defendants began their construction. *See* Pltf's Supp. Exh. 1 at ¶8; Docket Entry 26, Exh. 2 at ¶13; Exh. 4

at ¶18.  Notably, when Defendants obtained their "Provisional & Confidential" survey of the subject property and surrounding properties in August 2009, they identified all Plaintiff's well locations as "ABANDONED" (*see* Pltf's Supp. Exh. 5), leading to the logical conclusion that Defendants actually believed the well locations were abandoned or knew the wells were <u>not</u> abandoned and proceeded with construction intentionally or with a conscious indifference to the rights of Plaintiff.  *See* Pltf's Supp. Exh. 1 at ¶8. Defendants' project manager stated two months after construction began that he wrongly believed Plaintiff's wells had been abandoned.  *See id.*; Docket 26, Exh. 2 at ¶22; Docket 26, Exh. 4 at ¶17.

31.    Notwithstanding Defendants' erroneous belief (if one were to give Defendants the benefit of the doubt) or intentional, malicious action (the more likely scenario as suggested by subsequent conduct and given the money to be made by Defendants' project – or money lost by not completing the project on time), because the well pump was still working, the back pressure from the meter shut-off, in the opinion and experience of Mr. West, caused Plaintiff's well equipment to load up with corrosive fluids and sands, which caused the well to be shut-in and no longer productive of natural gas.  *See* Pltf's Supp. Exh. 1 at ¶9; Docket Entry 26, Exh. 2 at ¶13 and Exh. 4 at ¶18.   In either event, there is evidence to support both negligence and gross negligence.

32.    Texas Health and Safety Code section 756.123, entitled "*Prohibition of Construction Without Notice*," expressly states:   "*A person may not build, repair, replace, or maintain a construction on, across, over, or under the easement or right-of-way for a pipeline facility unless notice of the construction is given the operator of the*

---

*pipeline facility __and__ [at least one of four enumerated events occurs]*." TEX. HEALTH & SAFETY CODE §756.123. Plaintiff is the operator of a gas pipeline on the subject property, a fact which has not been disputed. *See* Pltf's Supp. Exh. 1 at ¶10; Docket Entry 26, Exh. 2 at ¶3. Plaintiff's pipeline existed on the property many years prior to the time Defendants obtained any rights to the property. *See* Pltf's Supp. Exh. 1 at ¶10. This fact has similarly gone undisputed. Defendants have not disputed that they are "*persons*," for purposes of the statute, who sought to "*build, repair, or maintain a construction on, across, over, or under the easement or right-of-way for a pipeline facility*." Thus, the duty owed by Defendants to Plaintiff, as the operator of a pipeline facility, is imposed by statute. *See* TEX. HEALTH & SAFETY CODE ANN. §756.123.

33. There is no dispute that Defendants began construction of its project prior to providing notice to Plaintiff or obtaining consent from Plaintiff to cross Plaintiff's pipelines. *See* Pltf's Supp. Exh. 1 at ¶11. Defendants simply assert that they "gave notice of the proposed *additional* construction and operations to [Plaintiff], and also sought to enter into [a] . . . crossing agreement," declining to inform the Court that the "notice" and request for a crossing agreement came *only after* construction had begun and Plaintiff had sustained damages. Docket 24, Exh. 1 at ¶7. The crossing agreement that Defendants implicitly assert was sought in good faith was, in fact, sought only *after* Plaintiff's pipelines had already been illegally crossed. *See* Pltf's Supp. Exh. 1 at ¶11; Docket Entry 26, Exh. 2 at ¶20-¶22; Docket Entry 26, Exh. 4 at ¶15-¶17.

34. When an oil and gas engineer retained by Plaintiff went to the subject property in January 2010, the construction on and around Plaintiff's pipeline was assessed by Plaintiff. *See* Pltf's Supp. Exh. 1 at ¶12; Docket Entry 26, Exh. 2 at ¶15;

Docket Entry 26, Exh. 4 at ¶20. When the engineer turned on the gas meter (that had been turned off when construction started), the well started flowing at the wellhead, but it did not show production at the meter, which, in Mr. West's experience and opinion, indicated there had been damage to the pipeline because if the pipeline had been patent then there would have been production at the meter. *See* Pltf's Supp. Exh. 1 at ¶12; Docket Entry 26, Exh. 2 at ¶15; Docket Entry 26, Exh. 4 at ¶20. Notably, between the wellhead and the meter were areas of heavy construction by Defendants over Plaintiff's pipeline, which in high probability, together with the lack of other likely causes, caused the damage to the pipeline. *See* Pltf's Supp. Exh. 1 at ¶12; Docket Entry 26, Exh. 2 at ¶15; Docket Entry 26, Exh. 4 at ¶20.

35. After "learning" that Plaintiff's wells on the subject property were still productive and being informed that Defendants' construction had damaged Plaintiff's pipeline and equipment, the project manager for Defendants acknowledged that Plaintiff's pipelines had already been crossed, stated he needed a pipeline crossing agreement and informed Plaintiff that it could "absolutely not" perform work on repairing Plaintiff's damaged pipeline. *See* Pltf's Supp. Exh. 1 at ¶13; Docket Entry 26, Exh. 2 at ¶17; Docket Entry 26, Exh. 4 at ¶22.

36. Later in January 2010, Defendants, through their managers, requested information pertaining to Plaintiff's well locations, as well as and proposed well locations, the information of which was provided as requested. *See* Pltf's Supp. Exh. 1 at ¶14; Docket Entry 26, Exh. 2 at ¶19; Docket Entry 26, Exh. 4 at ¶24. Plaintiff was expressly told by Defendants' project manager that Plaintiff would be paid for its time and expenses, including all its damages and repairs to the damaged pipeline and well,

provided it would work to enter into a pipeline crossing agreement. *See* Pltf's Supp. Exh. 1 at ¶14; Docket Entry 26, Exh. 2 at ¶19; Docket Entry 26, Exh. 4 at ¶24. Plaintiff agreed to those terms and began negotiating a pipeline crossing agreement between the parties. *See* Pltf's Supp. Exh. 1 at ¶14; Docket Entry 26, Exh. 2 at ¶19; Docket Entry 26, Exh. 4 at ¶24. Later correspondence from Defendants' project manager confirmed his agreement to "keep [Plaintiff] whole" for the heavy construction that damaged Plaintiff's property. Pltf's Supp. Exh. 1 at ¶14; Docket Entry 26, Exh. 2 at ¶19; Docket Entry 26, Exh. 4 at ¶24; Docket Entry 26, Exh. 8.

37.     In the following weeks, Defendants requested voluminous documents and information from Plaintiff with regard to Plaintiff's pre-existing operations and property rights, burdensome requests with which Plaintiff complied at substantial time and cost. *See* Pltf's Supp. Exh. *1 at* ¶15; Docket Entry Exh. 2 at ¶21; Docket Entry 26, Exh. 4 at ¶26. Plaintiff also provided the requested terms for a crossing agreement, the effort of which was futile given Defendants' continual refusal to incorporate requested terms. *See* Pltf's Supp. Exh. 1 at ¶15. In other words, Defendants' refusal to incorporate substantive terms proposed by Plaintiff facilitating future operations of Plaintiff into a crossing agreement made compliance by Plaintiff with the agreement with Defendants impossible. *See id.*

38.     In early February 2010, one of Defendants' project managers admitted to Plaintiff that he mistakenly believed Defendants' predecessor owner had facilitated all necessary rights to perform wind farm construction and operations. *See* Pltf's Supp. Exh. 1 at ¶16; Docket Entry 26, Exh. 2 at ¶22; Docket Entry 26, Exh. 4 at ¶27. The manager further admitted that "several things had fallen through the cracks" on this

matter and that it was for this reason Defendant, Edison, did not take steps to confirm all proper arrangements had been made.  *See* Pltf's Supp. Exh. 1 at ¶16; Docket Entry 26, Exh. 2 at ¶22; Docket Entry 26, Exh. 4 at ¶27.

39.    Later in February 2010, Plaintiff received plat information from a land surveyor indicating that a wind tower pad that had been placed by Defendants was too close to a well that had previously been proposed for vertical drilling by Plaintiff.  *See* Pltf's Supp. Exh. 1 at ¶17; Docket Entry 26, Exh. 2 at ¶24 and Exh. 4 at ¶29; Pltf's Supp. Exh. 6.  The placement of this tower pad too close to one of Plaintiff's proposed well locations by Defendants will require Plaintiff to drill further away from the proposed vertical well location; which, consequently, will require horizontal or directional drilling because the drilling will not occur directly over the prospect; which will cause Plaintiff to incur the additional effort and expense of directionally or horizontally drilling the well.  *See* Pltf's Supp. Exh. 1 at ¶17; Docket Entry 26, Exh. 2 at ¶24 and Exh. 4 at ¶29.  Plaintiff also learned that Plaintiff's future proposed geophysical seismic operations, future drilling operations, flow and distribution and gathering systems operations would be impaired by the wind farm's towers and underground electric transmission lines.  *See* Pltf's Supp. Exh. 1 at ¶17; Docket Entry 26, Exh. 2 at ¶24 and Exh. 4 at ¶29.

40.    As a result of Defendants' conduct, Plaintiff has been unable to comply with certain existing business obligations, including the production and sale of natural gas from the subject property to Houston Pipeline.  *See* Pltf's Supp. Exh. 1 at ¶18; Docket Entry 26, Exh. 2 at ¶25 and Exh. 4 at ¶30; Pltf's Supp. Exh. 4.  Plaintiff has incurred direct costs and expenses in efforts to diagnose and repair its damaged property, it has sustained a loss of income and profits, documents of which have been

produced to Defendants, it has paid for counsel associated with negotiating a pipeline crossing agreement based on the representation Defendants would reimburse such fees and it has been required to retain the services of counsel to enforce the agreement entered between Plaintiff and Defendants, as well as to recover for damages caused by Defendants' acts or omissions.  *See* Pltf's Supp. Exh. 1 at ¶18; Docket Entry 26, Exh. 2 at ¶25, Exh. 4 at ¶30, Exh. 5, and Exh. 10.

## VI.
## CONCLUSION

41.    Plaintiff is the lessor of mineral interest rights on De La Garza Survey 336, the subject property, and has been for many years, long before 2009.  It also owns and operates pipelines on the subject property, as well as adjacent properties, and has for many years, long before 2009.  The minerals produced on the subject property were transported from Plaintiff's well locations through those pipelines to a meter, where the minerals were sold to Houston Pipeline Company pursuant to a contract between Plaintiff and the Houston Pipeline Company.

42.    In 2009, Defendants obtained surface use rights to the subject property that were expressly granted subject to pre-existing mineral interest rights. Notwithstanding the conditional grant of their surface use rights, Defendants built roads and crossed transmission and utility lines over Plaintiff's pipelines in at least a dozen areas, damaging the pipelines and causing consequent damage to Plaintiff's well equipment, which caused a decrease in production of minerals and had a consequent adverse impact on Plaintiff's contract with Houston Pipeline Company.

43.     Plaintiff's mineral interest rights to the subject property have been a matter of public record for years prior to the time Defendants acquired their subservient surface use interest.  Despite the available recordings of Plaintiff's pre-existing mineral interests in Webb County land records, Defendants performed their heavy construction and commenced operations without notice to or the consent of Plaintiff, even denying Plaintiff access to its own equipment for evaluation or repair.

44.     When, during the initial periods of Defendants' heavy construction phase, Defendants were informed of Plaintiff's superior property interest, Defendants agreed to compensate Plaintiff for its damages if Plaintiff would work to enter into an 'after-the-fact' crossing agreement.     Unfortunately, Defendants' persistent refusal to accommodate Plaintiff's future proposed operations in the crossing agreement made compliance by Plaintiff impossible.  Further, when informed that a proposed wind tower pad was too close to a well location that Plaintiff had previously proposed for vertical drilling, Defendants proceeded with construction of the wind tower pad in any event, which has necessitated Plaintiff to reassess the proposed well location for horizontal or directional drilling at substantial additional expense to Plaintiff.

45.     Defendants' negligent, grossly negligence, reckless and/or intentional conduct has been the proximate cause of substantial damages and attorneys' fees for which Plaintiff seeks recovery.  Because there is a genuine issue of material fact on each of Plaintiff's claims remaining before the Court, the remainder of Defendants' summary judgment motions should be denied.

WHEREFORE,     PREMISES     CONSIDERED,     Plaintiff,     CORDELE DEVELOPMENT CORPORATION, prays that the remaining portions of Defendants',

WANZEK CONSTRUCTION, INC., EDISON MISSION ENERGY, and CEDRO HILL WIND, LLC's motions for summary judgment be denied, that costs of Court be taxed against Defendants and for other and further relief, both in law and in equity, to which Plaintiff may be justly entitled.

Respectfully Submitted,


/s/ Phil Watkins
PHIL WATKINS
State Bar No. 20927400

**PHIL WATKINS, P.C.**
926 Chulie Drive
San Antonio, Texas  78216
Telephone:  (210) 225-6666
Telecopier:  (210) 225-2300
phil@philwatkins.com

and


/s/ Arnulfo Gonzalez, Jr.
ARNULFO GONZALEZ, JR.
State Bar No. 08133000

**LAW OFFICE OF ARNULFO GONZALEZ, JR.**
1510 Calle Del Norte, Suite 16
Laredo, Texas  78041
Telephone:  (956) 722-0071
Telecopier:  (956) 725-2401

and


/s/ John A. Fuentes
JOHN A. FUENTES
State Bar No. 24012662
Federal Bar No. 665272

**THE FUENTES LAW FIRM, PLLC**
926 Chulie Drive
San Antonio, Texas  78216
Telephone:  (210) 225-6666
Telecopier:  (210) 225-2300
jfuentes@fuenteslawfirm.com

ATTORNEYS FOR PLAINTIFF,
CORDELE DEVELOPMENT CORPORATION

---

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to the following individuals pursuant to the Federal Rules of Civil Procedure and/or the local rules of this Court this 26th day of October, 2012:

Mr. Penn C. Huston
Mr. William R. Burns
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002-5219
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
phuston@kslaw.com
bburns@kslaw.com

Mr. Anthony Trevino
Mr. Kenneth A. Valls
Treviño, Valls, & Haynes, L.L.P.
6906 Springfield Avenue, Suite 200
Laredo, Texas 78041
Telephone: (956) 722-1417
Facsimile: (956) 712-0411
kvalls@tvhlawfirm.com

Ms. Joanna Lippman Salinas
Fletcher, Farley, Shipman & Salinas
1717 W. 6th Street, Suite 300
Austin, Texas 78703
Telephone: (512) 476-5300
Facsimile: (512) 476-5771
joanna.salinas@fletcherfarley.com

/s/ John A. Fuentes
JOHN A. FUENTES